UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH F. FRANKL, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>Petitioner,<br><br>v.<br><br>UNITED SITE SERVICES OF CALIFORNIA, INC.,<br><br>Respondent. | No. 2:15-CV-01360-TLN-CKD<br><br>**ORDER** |

This matter is before the Court pursuant to Petitioner Joseph F. Frankl's ("Petitioner") Corrected Petition for Injunctive Relief. (Corrected Pet., ECF No. 21-3.) Respondent United Site Services of California Incorporated ("Respondent") opposes the petition. (Opp'n, ECF No. 16-1.) In response, Petitioner has filed a Corrected Reply. (ECF No. 21-5.) The Court has carefully considered the arguments raised in the parties' briefing. For the reasons set forth below, the Petitioner's Corrected Petition for Injunctive Relief is hereby GRANTED.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

Petitioner is Regional Director of Region 20 of the National Labor Regions Board and

brings this action on behalf of the National Labors Relations Board ("the Union"). Respondent is in the business of delivering and maintaining portable toilets, porta potties, restroom trailers, and temporary fencing rentals. (ECF No. 21-3 at 2.) Respondent provides said services to a wide range of customers from its Benicia, California facility, which is the only facility at issue in the present proceedings. (ECF No. 16-1 at 3.) The Union filed a petition to represent a bargaining unit of Respondent's Benicia employees in September 2013 (the Unit), subsequently won a Board conducted election, and was certified by the Board on January 7, 2014, as the exclusive collective-bargaining representative of the Unit. (ECF No. 21-3 at 2; Exs. 2, 3.) The Unit has consisted of approximately 25 employees made up of Yard Associates, Service Technicians, Pick-up and Delivery (P&D) Drivers, Mechanics, Fence Installers, and other employees. (ECF No. 3-1, Ex. 3.)

On January 7, 2014, the Union was certified by the National Labor Relations Board as the exclusive bargaining representative of certain employees of the Respondent working in Benicia, California. (ECF No. 3-1, Ex. 3.) From February 26, 2014 to July 9, 2014, the Union and Respondent negotiated for a collective bargaining agreement. (Durham Decl., ECF No. 16-2 at ¶ 2.) The final negotiation session between the Parties was held on July 9, 2014. (Durham Decl., ECF No. 16-2 at ¶ 2.) After no agreement was reached on July 9, 2014, neither Party requested further negotiations. (Durham Decl. , ECF No. 16-2 at ¶ 2.)

On October 6, 2014, the Union engaged in a strike and picketing at the Respondent's Benicia facility. (Bartholomew Decl., ECF No. 16-7 at ¶ 4.) The following twenty-one employees, holding the stated positions, went out on strike (hereinafter referred to as "Unit Strikers"):

> Marco Rodriguez Cervantes (P&D); Isidoro Gonzalez (Service Tech); Tommie Barnett (Pick Up & Delivery Driver); Darryl Little (Service Tech); Jaime Munguia Villegas (Yard Associate); Jorge Rodriguez (Service Tech); Julio Rivera Laguna (Yard Associate); Edgar Martinez (Service Tech); Benjamin Rodriguez Pantoja (Yard Associate); Jose Oreliana (Service Tech); Daniel Ruiz (Yard Associate); Bobby Owens (Service Tech); Gerardo Alvarez (Service Tech); Walter Buckner (Service Tech); David Reeves (Service Tech); Mariano Herrera (Service Tech); Ernesto Pantoja (Service Tech); Juan Romo Perez (Fence Driver); Robert Harris (Service Tech); Isidoro Gonzalez (Mechanic); and Salvador Flores

(Service Tech). (Bartholomew Decl., ECF No. 16-7 at ¶ 4.) During the strike, four employees chose to cross the picket line and work for Respondent during the strike. (Pet.'s Ex. 9, ECF No. 3-2.) From October 6 to October 16, 2014, Respondent hired permanent replacements for all positions vacated by the above-stated striking employees. (Bartholomew Decl., ECF No. 16-7 at ¶ 5.) On October 16, 2014, Respondent informed the Union by mail that it had hired "permanent" employees to replace the strikers. (Durham Decl., ECF No. 16-2 at ¶ 3, Ex. A.) On October 17, 2014, on behalf of the above-stated striking employees, the Union offered to return to work. (Durham Decl., ECF No. 16-2 at ¶ 4; Pet.'s Ex. 5, ECF No. 3-1.) Respondent informed the Union that there were not available positions and created a recall list for the 21 strikers. (Pet.'s Ex. 4, ECF No. 3-1 at 34.) Between December 2014 and March 2015, Respondent recalled only six former strikers. (Pet.'s Ex. 30, ECF No. 3-3 at 1 n.1.) On March 27, 2015, Respondent withdrew recognition from the Union, pursuant to a petition indicating that the signatory employees no longer wished to be represented by the Union. (Bartholomew Decl., ECF No. 16-7 at ¶ 6; Ex. B, ECF No. 16-9.) The administrative investigation that followed the Union's filing of the underlying Board cases resulted in the issuance of the Complaint. Soon thereafter, the Board authorized Petitioner to seek this temporary injunction.

## II.    STANDARD OF LAW

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20249 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Under Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction to preserve the relative positions of the parties pending a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

Further, the Ninth Circuit has held that the "sliding scale test for preliminary injunctions

3

remains viable after the Supreme Court's decision in Winter." *Alliance for the Wild Rockies*, 632 F.3d 1127, 1134 (9th Cir. 2011). Under this test, the plaintiff must "make a showing on all four prongs" of the Winter test to obtain an injunction; however, if a plaintiff establishes a "balance of hardships tip sharply in the plaintiff's favor" and "serious questions going to the merits," a preliminary injunction may issue on a lesser showing of irreparable injury and that the injunction is in the public interest, so long as the court considers all four factors. *Id.* at 1135 (citing *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). However, the court need not reach the other prongs if the plaintiff cannot as a threshold matter demonstrate at least a "fair chance of success on the merits." *Pi mental v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008)).

### III.    ANALYSIS

Section 10(j) of the National Labor Relations Act authorizes the National Labor Relations Board ("NLRB") to seek temporary injunctions against employers and unions in federal district courts to stop unfair labor practices while the case is being litigated before administrative law judges and the Board. Petitioner asserts that this remedy is warranted because Respondent: (1) refused to reinstate at least seven of the former strikers and prematurely removed three others from preferential recall consideration in violation in Section 8(a)(3) of the National Labor Relations Act ("the Act"); (2) alternatively, Respondent's refusal to recall all of the former Unit Strikers was unlawful under *Hot Shoppes, Inc.* (New York, N.Y.), 146 NLRB 802 (1964); and (3) Respondent's withdrawal of recognition was unlawful. The Court addresses each of the four *Winters* factors below.

A. <u>Likelihood of Success on the Merits</u>

Section 8(a)(3) of the Act, codified as 29 U.S.C.A. § 158(b)(3), provides that "it shall be an unfair labor practice for a labor organization or its agents [to]—(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title." Subsection (d) states:

> For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and

> confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, [t]hat where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification . . .

Under the current regime, there are two types of strikes: economic strikes and unfair labor practice strikes. This distinction is important because under the doctrine of *N.L.R.B. v. Mackay Radio & Telegraph Co.*, 304 U.S. 333 (1938), the employer may hire permanent replacements in the place of economic strikers and refuse to reinstate a permanently replaced economic striker even after the striker requests to return to work. Economic strikers who unconditionally apply for reinstatement at a time when permanent replacements occupy their jobs are generally not entitled to reinstatement until "the departure of replacements." *See In re Detroit Newspaper Agency*, 340 N.L.R.B. 1019, 2003 WL 22810955 (2003). However, permanently replaced economic strikers remain employees and are placed on a preferential recall list with rights to reinstatement to their jobs or substantially equivalent jobs unless they obtain regular and substantially equivalent employment in the meantime. *Id.* In contrast, the employer may not hire permanent replacements during an unfair labor practice strike, a strike caused or prolonged in whole or in part by employer unfair labor practices. *Mackay Radio & Telegraph Co.*, 304 U.S. 333. Strikers engaged in an unfair labor practice strike are entitled to be reinstated to their former positions as soon as they make an unconditional offer to return to work, even if the employer has hired replacements to fill the positions. *See N.L.R.B. v. International Van Lines*, 409 U.S. 48, 50–51 (1972).[1]

---

[1] Even a strike which begins as an economic strike can be converted to an unfair labor practice strike by employer unfair labor practices. *See N.L.R.B. v. Moore Business Forms, Inc.*, 574 F.2d 835 (5th Cir. 1978). In such cases, the date of conversion becomes important. For example, if permanent replacements were hired while the strike was still an economic strike the employer may retain the replacements; if not, the strikers are entitled to the positions. *See In re Ryan Iron Works, Inc.*, 332 N.L.R.B. 506, 508 (2000) ("Strikers whom the [employer] permanently replaced prior to the strike's conversion date have only the preferred reinstatement right of economic strikers."); *SKS Die Casting & Machining, Inc.*, 307 N.L.R.B. 207, 208 (1992) ("employer need not discharge [permanent] replacements … during an economic strike, even if the strike and the strikers therafter convert to unfair labor practice status").

1    The parties' briefing defines the strike predicating this suit as an economic strike.  (*See*
2  ECF No. 21-4 at 4:13; ECF No. 16-1 at 10:20.)  Thus, the first inquiry is whether Respondent did
3  in fact hire permanent replacements that have foreclosed Unit Strikers' ability to reclaim their
4  previous or equal positions.  Petitioner asserts that many of the workers that Respondent asserted
5  were permanent full-time workers were in fact fill-in workers from Respondent's other locations.
6  Respondent does not really address this assertion and instead focuses its briefing on whether or
7  not employers are allowed to use permanent replacement works with the specific intent of
8  weakening a union's bargaining position.  (ECF No. 16-1 at 9–10.)

9    Here, it seems that at least one or more employees that Respondent touted as permanent
10 employees in October of 2014 were not in fact permanent employees at that time.  For example,
11 two of the employees that Respondent asserted were permanent replacements as of October 10,
12 2014, Greg Beddoes and Desiree Martinez (Pet. Ex. 1, ECF No. 3-1 at 4), testified that they were
13 permanent employees at Respondent's Reno, Nevada yard well prior to October 2014, and
14 understood that their service in Benicia would be temporary.  (Pet.'s Ex. 13, ECF No. 3-2 at 1:1,
15 4:17–23; Pet.'s Ex. 14, ECF No. 3-2 at 1:1, 3:5–15.)  Both Beddoes and Martinez testified to
16 having worked intermittently at Benicia, (Ex. 13, ECF No. 3-2 at 2:12–18, 3:1-2; Ex. 14, ECF
17 No. 3-2 at 3:5–7, 4:8–19), that Respondent covered room and board during their intermittent trips
18 to Benicia, (Ex. 13, ECF No. 3-2 at 3:15–17; Ex. 14, ECF No. 3-2 at 3:6–7), and to declining
19 Benicia Manager Steve Gutierrez's offer of permanent transfers in the first week they worked in
20 Benicia.  (Ex. 13, ECF No. 3-2 at 4:20–22; Ex. 14, ECF No. 3-2 at 3:11–15).  Beddoes testified
21 that he did not become a permanent employee at Benicia until December 2014:

22> When I first went to Benicia, Steve never told me I was being
> permanently hired in Benicia. I have never been told my [sic]
23> anyone that I am now employed in Benicia, that I am technically a
> Benicia employee, or anything like that. Steve never used the term
24> "permanent replacement" to describe my work in Benicia. Steve
> asked me several times if I would like to transfer. At first I thought
25> he was kidding, but he kept asking me. This last time, Steve asked
> me again, and I agreed to transfer permanently. I signed this
26> paperwork this last Thursday [December 11, 2014].

27

28 (Pet.'s Ex. 13, ECF No. 3-2 at 4:17–22.)  Similarly, Martinez stated: "Steve never told me that I

6

was a permanent replacement, or that I was going to be a permanent employee in Benicia. Kivett never said any such thing either. From my understanding, my dad and I were essentially on loan." (Pet.'s Ex. 14, ECF No. 3-2 at 4:21–23.)

Respondent fails to provide facts to dispute this testimony. Nor does Respondent assert that Beddoes and Martinez were not among the permanent employees that were hired to replace the Striking Employees. Thus, Petitioner has provided evidence that Respondent improperly denied at least two strike employees reinstatement and has shown a likelihood of success on his section 8(a)(3) claim. Moreover, this behavior is consistent with an intention, on Respondent's part, to remove union members/supporters from Respondent's workforce in an effort to undermine the union's authority and representation. Thus, this factor weighs in favor of granting injunctive relief.[2]

B. <u>Irreparable Harm</u>

In the Ninth Circuit, "the Regional Director 'must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'" *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). "[I]rreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *Id.* at 1362. "A likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances." *Id.* at 1363; *see also Frankl v. Adams & Associates, Inc.*, 74 F. Supp. 3d 1318, 1330 (E.D. Cal. 2015) ("[T]he discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process.") (internal quotation and citation omitted).

Respondent asserts that Petitioner's delay in bringing this suit undermines its argument of irreparable harm. Although there was a delay in filing the instant petition (June 2015) compared

---

[2] Because Petitioner has shown a likelihood of success on the section 8(a)(3) claim, the Court need not address Petitioner's alternative theories of liability.

with the dates of the alleged activity (October 2014), this timeline reflects the reality that the Board must have sufficient amount of time to investigate the charge before filing a petition for injunction.  In this case, the Court concludes that the eight to nine month delay does not undermine a finding of irreparable harm.  *See Sharp ex rel. N.L.R.B. v. Webco Indus., Inc.*, 225 F.3d 1130, 1136 (10th Cir. 2000) ("Although the amount of time that may elapse before the Board's action can be considered unreasonable is, to a large extent, case-specific, there is a certain leniency that the Board must be afforded, stemming from the deference to the Board that is built into the statutory scheme."); *Adams & Assoc.*, 74 F. Supp. 3d at 1330 (finding that a nine month passage of time did not bar injunction); *Reichard v. Foster Poultry Farms*, 425 F.Supp.2d 1090, 1101 (E.D. Cal. 2006) (five-month passage of time; "[d]elay in the federal bureaucracy is an unfortunate ramification of the operation of government"); *see also Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) (eighteen-month passage of time not a bar to injunction); *Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 545 (4th Cir. 2009) (same).  The Court finds that injunctive relief would restore some semblance of the status quo and prevent further evaporation of the Unit and employee rights in the interim.  Therefore, this factor also weighs in favor of granting injunctive relief.

    C.  <u>Balance of the Equities</u>

To determine the balance of hardships, "the district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority." *HTH Corp.*, 650 F.3d at 1365 (internal quotation and citation omitted).  Where a "Regional Director ha[s] shown likely irreparable harm to the collective-bargaining process there [i]s also considerable weight on his side of the balance of the hardships." *Id.* at 1365.

Here, the balance of hardships favors the imposition of injunctive relief, and Respondent does not argue otherwise in its opposition.  A return of the strikers and an order requiring Respondent to recognize and bargain with the Union on an interim basis is necessary to restore the status quo ante, to stem employees' flight from the Union, and to protect the Board's remedial authority.  Ordering Respondent to bargain on an interim basis has little consequence for

Respondent, while not doing so will likely ensure that the Unit employees' Board-certified choice for union representation will be nullified. *See, e.g., Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1196 (9th Cir. 2011) ("On the other side of the balance of the equities, when [t]he company is not compelled to do anything except bargain in good faith,' the risk from a bargaining order is 'minimal.") (citation omitted); *see also Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1054 (2d Cir. 1980) (collective-bargaining agreement reached by parties in the interim may contain a condition subsequent should the Board's ultimately refuse to grant a final bargaining order remedy). Thus, the Court finds that this factor weighs in favor of granting injunctive relief.

### D. Public Interest

Section 10(j) was enacted "to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Frankl v. HTH Corp.*, 650 F.3d 1334, 1365 (9th Cir. 2011). "The Ninth Circuit has noted that the passage of the statute is itself an implied finding by Congress that violations will harm the public." *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d 1201, 1216 (E.D. Cal. 2010) (citation omitted). Thus, the public interest served in a Section 10(j) case is to preserve employees' rights to engage in Section 7[3] activity pending the outcome of Board litigation and, because Petitioner has shown a likelihood of success and likely irreparable harm, injunctive relief necessarily advances the public interest. Respondent has not asserted a countervailing public interest that would be harmed by the granting of a temporary injunction.

### IV.   CONCLUSION

For the aforementioned reasons, the Court finds that injunctive relief is appropriate in this case. In Respondent's opposition, Respondent expresses numerous concerns about the Petitioner's proposed orders lacking in specificity as to the required actions and also being overly broad. (ECF No. 16-1 at 11–14.) Having considered Respondent's opposition as well as Petitioner's corrected reply, the Court orders as follows: pending the final disposition of the

---

[3] Section 7 of the National Labor Relations Act (the Act) guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," as well as the right "to refrain from any or all such activities."

matter herein now pending before the Board, it is ordered that:

(1) Within fourteen (14) days of this Order, the parties shall meet and confer as to which Union Strikers have and have not received valid reinstatement offers.  Within twenty-one (21) days of the entry of this Order, the parties shall then furnish this Court with a joint proposed order detailing the employees that are to be reinstated or added to a preferential recall list and the manner in which to effect such reinstatement offers;

(2) Respondent is enjoined from withdrawing recognition from Teamsters, Local 315 ("the Union") as the exclusive collective-bargaining representative of the following unit employees at its Benicia, California facility, including all full-time and regular part-time Service Technicians, Lead Service Technicians, P&D Drivers, Mechanics, Laborers, and Fence Installers employed by the Employer at its 1 Oak Road, Benicia, California facility, but excluding Dispatchers, Supervisors and Guards as defined by the Act.

IT IS SO ORDERED.

Dated: February 16, 2016

_____
Troy L. Nunley
United States District Judge